IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

ANTONIO P. MARTINEZ,

            Plaintiff,

v.                                    No. CIV 09-415 LFG/DJS

OFFICE DEPOT, INC., BOBBY GRANT,
and TRAVIS TODD,

            Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** is before the Court on Defendants' Motion for Summary Judgment and Memorandum in Support. [Doc. 42].  Plaintiff Antonio Martinez ("Martinez") responded and Defendants replied. [Doc. Nos. 46, 52.]  After careful consideration of the pleadings, attachments, and pertinent law, the Court determines that the motion for summary judgment should be granted in part and denied in part.

## PROCEDURAL AND FACTUAL BACKGROUND

On March 25, 2009, Martinez filed a complaint in state court against Office Depot and two individual defendants[1] alleging national origin and age discrimination under Title VII of the Civil Rights Act of 1964 ("Title VII"), the New Mexico Human Rights Act ("HRA"), and the Age

---

[1]In his response to the motion for summary judgment, Martinez states that the Title VII and ADEA claims against individual defendants Bobby Grant and Travis Todd are withdrawn. [Doc. 46, p. 12.]

Discrimination in Employment Act of 1967 ("ADEA"). [2] Martinez also brought state law claims of breach of employment contract and wrongful termination against Defendants and requested an award of punitive damages. [Doc. 1, Attached Complaint.] On April 29, 2009, Defendants removed the case to federal court. [Doc. 1.]

Defendants' motion for summary judgment argues there are no genuine issues of fact regarding any of the remaining claims and that they are entitled to summary judgment as a matter of law. [Doc. 42.] Martinez contends, *inter alia*, that he met his *prima facie* burden as to the discrimination claims and provided sufficient evidence of pretext to raise a genuine issue of fact for trial. In addition, Martinez asserts genuine issues of material fact exist as to the state law claims and his request for punitive damages. [Doc. 46, p. 24.]

ANALYSIS

Summary Judgment Standard

Summary judgment will be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c)(2); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The Court examines the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment. Applied Genetics Int'l, Inc. v. First Affiliated Sec. Inc., 912 F.2d 1238, 1241 (10th Cir. 1990).

---

[2]In his response, Martinez clarified that he did not bring disparate impact claims under Title VII or the ADEA and that he withdrew any claim brought under 42 U.S.C. § 1983. [Doc. 46, p. 12.] Based on the clarifications in Martinez's response, this Memorandum and Opinion addresses all of Martinez's remaining claims, *i.e.,* the Title VII and ADEA discrimination claims against Office Depot, the HRA discrimination claim against all three Defendants, the state law claims of breach of contract and wrongful determination against all three Defendants, and the request for punitive damages against Office Depot.

The party seeking summary judgment has an "initial burden to show that there is an absence of evidence to support the nonmoving [sic] party's case." Muñoz v. St. Mary-Corwin Hosp., 221 F.3d 1160, 1164 (10th Cir. 2000) (citation omitted). Upon meeting that burden, the non-moving party must "identify specific facts that show the existence of a genuine issue of material fact." Id.

The opposing party may not rest upon mere allegations and denials in the pleadings, but must set forth specific facts showing that there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). An issue of fact is "genuine if the evidence is significantly probative or more than merely colorable such that a jury could reasonably return a verdict for the non-moving party." Id. at 249-50. Mere assertions, conjecture, or the existence of a scintilla of evidence in support of the non-movant's position, are not sufficient to show a genuine issue of material fact; an issue of material fact is genuine only if the non-movant presents facts such that a reasonable jury could find in favor of the non-movant. Carpenter v. Boeing Co., 456 F.3d 1183, 1192 (10th Cir. 2006) (citations and quotations omitted).

Where a plaintiff relies on circumstantial evidence to prove discrimination, as is the case here, the Court applies the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).[3] Under McDonnell Douglas, Plaintiff first must establish a *prima facie* showing of discrimination. Id. at 802. If Plaintiff satisfies this showing, the burden of production shifts to Defendants to state a legitimate, non-discriminatory reason for the adverse employment action. If Defendants meet this burden, then summary judgment is warranted in their favor, unless Plaintiff

---

[3]The burden-shifting framework applies in ADEA cases as well as Title VII cases. Phillips v. The Pepsi Bottling Group, No. 08-1003, 2010 WL 1619259, at *3 (10th Cir. Apr. 22, 2010) (unpublished) (*citing* Thompson v. Weyerhaeuser Co., 582 F.3d 1125, 1130-31 (10th Cir. 2009)).

shows the existence of a genuine issue of material fact regarding whether the proffered reasons were pretextual. DeFreitas v. Horizon Inv. Mgmt. Corp., 577 F.3d 1151, 1162 (10th Cir. 2009).

A plaintiff can demonstrate pretext by producing evidence of "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its [adverse] action [such] that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." Garrett v. Hewlett-Packard Co., 305 F.3d 1210, 1217 (10th Cir. 2002) (internal citation omitted). "The relevant inquiry is not whether [the employer's] proffered reasons were wise, fair or correct, but whether [the employer] honestly believed those reasons and acted in good faith upon those beliefs." Rivera v. City and County of Denver, 365 F.3d 912, 924-25 (10th Cir. 2004) (internal citation omitted). The Court's "role is to prevent unlawful [employment] practices, not to act as a 'super personnel department' that second guesses employers' business judgments." Simms v. Okla. ex rel. Dep't of Mental Health and Substance Abuse Servs., 165 F.3d 1321, 1330 (10th Cir.) (internal citation omitted), cert. denied, 528 U.S. 815 (1999). However, "[t]here may be circumstances in which a claimed business judgment is so idiosyncratic or questionable that a factfinder could reasonably find that it is a pretext for illegal discrimination." Beaird v. Seagate Tech., 145 F.3d 1159, 1169 (10th Cir.), cert. denied, 525 U.S. 1054 (1998).

<u>Material Facts</u>[4]

In July 1993, Martinez began his employment with Office Depot in El Paso, Texas. [Doc. 12, Stipulations, p. 2.] Martinez is Hispanic and was born October 12, 1954. He was 53 years old when he was terminated on April 25, 2008. At the time of termination, Martinez was an Assistant

---

[4]The material facts are taken from the parties' summary judgment pleadings and stipulations in the Joint Status Report.

Store Manager at Office Depot's Cerrillos Road location in Santa Fe, New Mexico.  He had been

an Assistant Store Manager for about six years in two different Office Depot locations in Santa Fe.

Office Depot employed Martinez for fifteen years before he was terminated.  During his last

10 years of employment with Office Depot, including his tenure as assistant manager, Martinez was

never disciplined until his termination.  Moreover, he received favorable job appraisals during his

employment with Office Depot.[5]

Office Depot provides a customer incentive program whereby customers earn store credit

based on purchases made at Office Depot.  The store credit is given in the form of a Rewards Card

that customers may apply towards future purchases at Office Depot. [Doc. 42, p. 2, n. 1.][6] Office

Depot also offers prepaid gift cards.[7] The card in question was either a Rewards Card, gift card, or

perhaps a returned merchandise card. [Doc. 42, p. 2. n. 2.]  From time to time, customers may

inadvertently leave their Rewards Cards or other gift/money cards on the counter, or perhaps a store

associate forgets to return the card to the customer.  These cards that remain unclaimed at the store

---

[5]Some of these facts are taken from Plaintiff's Statement of Undisputed Facts in his response to the motion for summary judgment. [Doc. 46, p. 8.] Defendants argue that Rule 56(e)(2) does not contemplate a statement of material facts by the non-movant.  Defendants further assert that Martinez's affidavit [Doc. 46, Ex. 1] should be stricken in whole or in part because "some of the statements are not based on personal knowledge." [Doc. 52, pp. 5-6.] Rule 56(e) does not prohibit a non-moving party from setting out material facts for purposes of opposing summary judgment.  Indeed, Rule 56 states that a non-moving party must set out specific facts showing a genuine issue for trial. Fed. R. Civ. P. 56(e)(2).  The District's local rule further states that the party opposing summary judgment must include a "short, concise statement of the reasons in opposition to the motion with authorities." D.N.M. LR-Civ. 56.1(b).  In addition, while Office Depot states some of Martinez's affidavit statements are not based on personal knowledge, it does not specify which statements are improperly supported.  Moreover, if Office Depot sought to strike the affidavit or parts thereof, it should have filed a separate motion to strike.  Finally, the Court has set forth statements made by Martinez that are pertinent and material to the claims at issue, *e.g.,* Martinez's age, ethnic origin, and work history.  Office Depot provided no evidence to dispute these facts.  For example, Martinez stated in his affidavit that he received only positive job appraisals from Office Depot.  In its reply, Office Depot did not provide evidence to the contrary.

[6]Martinez disputes the information in the footnote to Defendants' Statement of Material Fact ("Defendants' MF") # 3 relating to the customer loyalty/awards program.  However, he failed to properly support any dispute with MF#3 or its footnote; thus, those facts are deemed admitted.

[7]Generally speaking neither the rewards cards nor gift cards have cash value but may be used to offset the purchase of goods at Office Depot.

are kept in the store manager's office in a cash drawer.  There is no evidence indicating that customers who lose or misplace cards are called or that their cards are mailed back to them.

On a prior occasion, in an effort to placate an upset customer, Steve Makelki, Martinez's former manager, instructed Martinez to use "a lost or unclaimed money card" to satisfy that customer.  [Doc. 46, Martinez Aff., at ¶ 12.]

In March 2008, an upset Office Depot customer called Martinez concerning the amount of credit she had received on her Office Depot Rewards Card.  She claimed she was not credited sufficiently; it is unknown how much credit she claimed or believed she was owed.  Martinez asked the customer to come to the store and advised her that he might be able to give her a $50 in-store credit.  When she later came to the store,[8] the customer sought to purchase a $17.00 rubber stamp. She advised the employee assisting her that Martinez had informed her he would provide her with in-store credit.  When the employee checked with Martinez, he instructed the employee to use an unclaimed money card being kept in the cash office at the store for the customer's purchase, just as manager Makelki previously directed Martinez to use an unclaimed money/rewards card to satisfy another customer.  The card at issue did not belong to the customer who wished to purchase the rubber stamp.  Instead, the card apparently had been left at the store and was unclaimed.

Martinez states the money card had been in a cash drawer in the store office for four or five months prior to its use in March 2008, or perhaps as long as one year.  Defendants stated the card "was being stored for safekeeping in petty cash . . . ." or in the "cash office."  [Doc. 52, p. 7; Doc. 42, p. 2.]

_____

[8]It is not clear when the customer finally came to the store, but there was evidence that the incident occurred in late March or early April.

Before authorizing the employee to use the money card for the customer, Martinez confirmed that the customer had a Rewards Card.  He did not verify the amount of credit the customer received or was owed before authorizing the use of the unclaimed money card to buy the $17.00 stamp.[9] Martinez was able to resolve the customer's concerns about store credit by using the unclaimed money card to credit the customer's purchase of the rubber stamp.

Travis Todd ("Todd"), who was 29 years old, was hired as Martinez's store manager shortly before Martinez authorized the use of the money card to the customer.  When Todd learned of Martinez's instruction to use the money card to pay for the customer's $17.00 stamp, Todd reported the incident to Office Depot's Loss Prevention Department.  Loss Prevention conducted an investigation.

Martinez acknowledged that he made a statement near the time he was terminated that he should have partnered with a store manager before authorizing the use of the unclaimed money card. On the date of his termination, he also admitted it was wrong to instruct an employee to use an unclaimed money card to credit another customer.  Martinez took responsibility for his actions in authorizing use of the unclaimed money card.

Martinez asserts that he made these acknowledgments or apologies in an attempt to prevent his termination.  He told Office Depot he would consult with his store manager in the future to avoid the situation that occurred.

Loss Prevention reported the findings to Robert Grant ("Grant"), the store's District Manager, and to Monica Wilson ("Wilson"), the store's Regional Human Resources Manager.  After

---

[9]While Martinez attempts to dispute Defendants' MF# 8, his deposition testimony demonstrates that he did not actually verify the amount of credit to which the customer was entitled.  Instead, he confirmed that she was in the Rewards Card program with Office Depot and verified her address, etc. [Doc. 46, Martinez Dep., p. 138.]

reviewing the results of the investigation, Grant and Wilson decided to terminate Martinez for misuse of the money card.  It is undisputed that Martinez obtained no benefit from the improper use of the unclaimed money card save for resolving a customer complaint.

There is a dispute as to whether Todd, the new store manager, took part in the termination decision.  For some reason, Defendants deny that Todd participated in the decision.  However, in their answers to interrogatories, Defendants included Todd, Grant, and Wilson as the individuals responsible for the termination decision. [Doc. 46, Ex. 6.]  Further, Wilson testified that Todd made the recommendation to terminate Martinez.

After Martinez was terminated it is disputed whether his replacement as assistant manger was a 32 year old white male[10] or a 40 year old African American male.  It is undisputed, however, that the position of Assistant Store Manager was not eliminated after Office Depot terminated Martinez.

Defendants claim there was other "questionable ethical behavior" exhibited by Martinez on several earlier occasions.  However, the Court does not consider the alleged conduct to be material to the summary judgment motion based on Defendants' explanation that Martinez was terminated for misuse of the money card.

Defendants state it was misconduct for Martinez to authorize use of the unclaimed money card for the customer in question.  The cited depositions transcripts do not always describe Martinez's use of the money card as actual "misconduct," although admittedly Martinez authorized use of one unknown customer's unclaimed money card for a different customer's $17.00 purchase.

---

[10]Grant testified that Todd hired or approved the hiring of a younger Anglo man for Assistant Store Manager, who Todd worked with and knew at a previous unrelated store.  [Doc. 46, Grant Dep., pp. 120-21.]

Defendants assert that Office Depot has consistently terminated other employees for unauthorized and fraudulent use of a money card, regardless of the amount.  Martinez disputed this material fact, and the deposition testimony supports Martinez's position that it was unclear if Office Depot ever terminated an employee who used an unclaimed money card to credit another customer. If an employee was terminated for unauthorized use of a money card, typically it occurred when an employee used a money card for his or her own benefit.

Under Office Depot's written policies and procedures, misuse or fraudulent use of a cash/rewards card is a serious offense that can result in an employee's termination.

In November 1999, Office Depot revised its "Performance Improvement Process." [Doc. 46, Ex. 7.] The scope of the Performance Improvement Process was directed to "[a]ll associates of Office Depot, Inc."  The "Performance Improvement Process" states, in part, that Office Depot "reserves the right to use some or all of the following forms of discipline: verbal counseling, Performance Improvement Process or immediate termination." [Id.] The provision also notes that some types of serious misconduct can result in immediate termination without previous warning, including dishonesty of any kind and misappropriation of money or supplies.  The process sets forth steps in performance improvement planning, including verbal counseling and a performance improvement plan.

In September 1996, Martinez signed an "Associate Acknowledgment Form," which states, in part:

> I have entered into my employment relationship with Office Depot voluntarily and acknowledge that there is no specified length of employment.  Accordingly, either I or Office Depot can terminate the relationship at will, with or without cause, at any time, with or without notice.

> Furthermore, I acknowledge that this Handbook is neither a contract
> of employment nor a legal document. . . .

[Doc. 42, Ex. 42-2, A-1.]

Office Depot's policy regarding at-will employment is included in its manual's or handbook's provision regarding "Termination of Employment." [Doc. 42, Ex. 42-2, A-2.] That provision, entitled "Employment at Will," states:

> The employment relationship between the Company and any
> associate may be terminated at the will of either party as stated in the
> employment application[11] signed upon request for employment. As
> described in that agreement, the policies and procedures set forth in
> this manual provide guidelines for management and associates during
> employment, but do not create contractual rights regarding
> termination or otherwise.

[Doc. 42, Ex. 42-2, A-2, p. 2.]

It is undisputed that Martinez signed an "at will" provision in 1996 that refers to receipt and review of Office Depot's handbook or manual. Notwithstanding Martinez's signature on the Associate Acknowledgment form, Martinez denies that he was an at-will employee at Office Depot. Instead, he claims that Office Depot failed to terminate him in accordance with its policy or progressive discipline procedures that required verbal counseling, followed by a written Performance Improvement Plan or an Action Plan, which is a written record of a misconduct or deficiency. [Doc. 46, Martinez Aff., at ¶ 17.]

Office Depot's equal employment opportunity policy, contained in its Associate Handbook, that is distributed to all employees (and Martinez), prohibits discrimination on the basis of any protected class, including national origin or age. Throughout his employment, Martinez received

---

[11]Neither party provided a copy of an employment application for Martinez.

training on Office Depot's equal employment opportunity and, as a manager, Martinez was expected

to be knowledgeable about the company's policies and procedures.

Martinez's Claims

**I.**     ***National Origin and Age Discrimination Claims:***

For purposes of summary judgment, Defendants do not dispute that Martinez satisfied a

*prima facie* case of age discrimination under the ADEA.  [Doc. 42, p. 11.] Indeed, the Tenth Circuit

Court of Appeals has emphasized that establishing a *prima facie* case of employment discrimination

is "not onerous."  Barone v. United Airlines, Inc., No. 08-1348, 355 F. App'x 169, 180 (10th Cir.

Dec. 7, 2009) (unpublished); Orr v. City of Albuquerque, 417 F.3d 1144, 1149 (10th Cir. 2005)

(describing burden of establishing *prima facie* case as "slight"); Annett v. Univ. of Kan., 371 F.3d

1233, 1241 (10th Cir. 2004) (describing *prima facie* showing as "relatively lax").

Defendants do, however, dispute that Martinez made a *prima facie* showing of national

origin discrimination under Title VII.[12] [Doc. 42, p. 15.]  According to Martinez, Defendants used

an erroneous test for purposes of determining the requirements of a Title VII *prima facie* case of

national origin discrimination, particularly with requiring a showing that Martinez was treated less

favorably than others not in the protected class.  [Doc. 46, pp. 18-19.]

To establish a *prima facie* case of discriminatory discharge based on national origin, "the

plaintiff must show that (1) he belongs to a protected class; (2) he was qualified for his job; (3)

despite his qualifications, he was discharged; and (4) the job was not eliminated after his discharge."

Sulich v. Sysco Intermountain Food Servs, Inc., No. 06-4247, 242 F. App'x 532, 534 (10th Cir. July

---

[12]Because the New Mexico Supreme Court applies the same evidentiary methodology articulated in
McDonnell Douglas to analyze employment discrimination claims under the HRA, the Court combines the analysis
of Martinez's employment discrimination claim brought under both Title VII and the HRA.  *See* Garcia-Montoya v.
State Treasurer's Office, 2001-NMSC-003, ¶ 39, 130 N.M. 25 (2001).

24, 2007) (unpublished) (*citing* Rivera v. City & County of Denver, 365 F.3d 912, 920 (10th Cir.

2004) (quotation omitted)).  *See also* Argo v. Blue Cross and Blue Shield of Kansas, Inc., 452 F.3d

1193, 1201 (10th Cir. 2006) (To establish a *prima facie* case of Title VII discrimination, a plaintiff

ordinarily must show that she belongs to some protected class, was qualified for the position,

suffered an adverse employment action, and "was treated less favorably than others (*e.g.*, the

position at issue remained open after the adverse employment action)."[13]

The Court concludes for purposes of the summary judgment motion, that Martinez satisfied

the *prima facie* elements of a Title VII or HRA national original discrimination claim.  He is a

member of a class protected by statute, he was terminated, he was qualified for the position, and his

position as Assistant Store Manager was not eliminated after he was terminated.  The Court again

observes that "[f]or most plaintiffs, establishing a prima facie case is perfunctory, and liability turns

on whether the defendant's stated explanation for the adverse employment action is pretextual."

Argo, 453 F.3d at 1201.

Because Martinez satisfied his burden in establishing the *prima facie* elements of national

origin and age discrimination, Office Depot had the burden of providing a legitimate,

nondiscriminatory reason for the termination decision.  Martinez concedes that Office Depot

satisfied its burden by explaining that it terminated him for the unauthorized use of a money card.

[Doc. 46, p. 13.]  Thus, the burden then reverts to Martinez to show the existence of a genuine

dispute of material fact as to whether Officer Depot's proffered reason for the termination was

pretextual, *i.e.*, unworthy of belief.

---

[13]The Court agrees that Plaintiff need not show that he was treated less favorably than others not in the protect class to satisfy the *prima facie* elements of the Title VII national origin claim.  *See, e.g.,* Kendrick v. Penske Transp. Servs., 220 F.3d 1220, 1229 (10th Cir. 2000) (noting that the United States Supreme Court has never addressed the question of whether comparison to a person outside of the protected class is required as part of the fourth-prong showing of plaintiff's *prima facie* case in discriminatory discharge cases).

Martinez may demonstrate genuine issues as to pretext by showing that Office Depot's proffered business justifications are so incoherent, weak, inconsistent, or contradictory that a rational factfinder could conclude the reasons were unworthy of belief. Paup v. Gear Products, Inc., No. 07-5164, 327 F. App'x 100, 113 (10th Cir. Jun. 19, 2009) (unpublished). This showing of pretext, of reason to disbelieve, by definition, "does not require a plaintiff to offer any direct evidence of actual discrimination." Id. (citing Timmerman v. U.S. Bank, N.A., 483 F.3d 1106, 1113 (10th Cir. 2007)).

In viewing all of the circumstances as it must, Beaird, 145 F.3d at 1174, the Court concludes that Martinez has presented sufficient evidence to raise a genuine issue of fact as to whether Office Depot's proffered reason for the termination is unworthy of belief. The most convincing evidence of pretext is the fact that Martinez was a 15-year employee of Office Depot, was promoted to Assistant Store Manager, held that position for six years, worked in two different store locations, received only favorable performance reviews, and was not been disciplined in the ten years before he was terminated rather precipitously. See Garrett, 305 F.3d at 1217 (evidence of pretext may include the prior treatment of the plaintiff).

Notwithstanding his favorable and long-term employment with Office Depot, Martinez was fired with very little notice[14] for using an unclaimed money card to appease a dissatisfied customer. The use of the money card did not provide any benefit to Martinez. In other words, he did not use the money card for his personal gain, nor did he use the unclaimed card to benefit a family member or friend. Indeed, it might be said that Martinez authorized its use for goodwill towards the store since the customer was upset with Office Depot, and Martinez's use of the unclaimed card resolved

---

[14]There was evidence presented that Martinez was terminated two days after an investigation was conducted.

13

the customer's concerns.  The unclaimed card had been languishing in the store for months and possibly a year without any customer claiming it, and apparently without any effort by Office Depot to contact the owner of the lost card to return it.[15]  Moreover, the amount of credit in question, $17.00, is meager evidence of dishonesty or wrongdoing, especially in view of Martinez's position as Assistant Store Manager and his longstanding employment with Office Depot.[16]

In addition, Office Depot's proffered reason that it terminated Martinez on the basis of misuse of a money card is suspect.  Martinez's provided uncontroverted testimony that a previous Office Depot manager had directed him to use a lost or unclaimed money card to satisfy another customer under similar circumstances.  The fact that a store manager can authorize the use of an unclaimed money card to satisfy an unhappy customer makes the decision appear discretionary in nature, rather than a decision that would subject a long-time employee and assistant store manager to immediate termination.  Martinez further testified that in his 15-year tenure with Office Depot he was unaware of any employee being terminated for using a lost or unclaimed money card to give credit to another customer on a purchase.

Both Office Depot District Manager Grant and Regional Human Resources Manager Wilson testified that there was no written policy that forbids use of an unclaimed money card to satisfy another customer.  Moreover, Grant knew of no other Office Depot employee terminated for use of a money card under the circumstances that led to Martinez's termination.  Similarly, Wilson was not

---

[15]One questions why a company would allow unclaimed cash value cards to lie around a store for so long and why they were not removed from the store.  It leads one to speculate that unclaimed money cards were being retained for some reason and perhaps for the very reason Martinez used the card.

[16]In the reply, Office Depot argues that Martinez's authorization of the unclaimed card resulted in a loss of revenue for the store, *i.e.,* purchase of the $17.00 stamp. [Doc. 52, p. 10.] This is questionable and perhaps not accurate.  The unclaimed and unused gift, money or rewards cards that Office Depot retained already had value on them that customers either paid for (cash gift cards) or had been credited (rewards cards).  Thus, at a minimum, there is a disputed fact whether Office Depot lost revenue based on the use of an unclaimed card.

aware that any Office Depot employee had been terminated for use of a money card to credit another customer.

There are also inconsistencies regarding who participated in the decision to terminate Martinez. Defendants allege that Grant and Wilson decided to terminate Martinez and that Todd was not part of the decision to terminate Martinez's employment. [Doc. 42, Defendant's MF #14; Doc. 52, ¶ 17.] Martinez testified that Todd terminated him and made the decision in Martinez's presence. [Doc. 42, Martinez Dep, at pp. 127-28.] Todd testified that he "had no voice" in the termination but that he (Todd) terminated Martinez with Blake (loss prevention manager) on the phone. [Doc. 42, Todd Dep., p. 145.] Grant and Wilson stated that they approved Martinez's termination. [Doc. 42, Grant Dep., p. 78; Wilson Dep, p. 35.] Grant explained further that he did not terminate Martinez but only approved his termination. [Doc. 46, Grant Dep. p. 77.] Wilson explained further that Todd approved the termination, along with Grant and herself. [Doc. 46, Wilson Dep., pp. 35-36.] In a verified response to Plaintiff's interrogatories, Defendants stated that Todd, Grant, and Wilson were "ultimately responsible" for Martinez's termination and that all three, along with Blake Langley, participated in the termination decision. [Doc. 46, Ex. 6.] It is not clear why Office Depot provides inconsistent explanations for who ultimately made the termination decision, but there clearly are unexplained inconsistencies.

The reasons for Martinez's termination vary as well. With respect to this lawsuit, Grant and Wilson consistently explained that Martinez was terminated for misuse or unauthorized use of a money card. [Doc. 46, Grant Dep. pp. 62-63.] Wilson testified they terminated Martinez for inappropriate use of a gift card. [Doc. 46, Wilson Dep., pp. 15, 122.] Both Grant and Wilson testified during their March 2010 depositions that they had never provided any other reasons for Martinez's termination. [Doc. 46, Grant Dep., p. 130; Wilson Dep., p. 122.]

15

However, in another lawsuit brought against Office Depot by a different former employee, Wilson was asked during a deposition in January 2009 why Martinez was terminated.  Wilson's deposition in that case occurred about a year before her deposition in this case, and only eight months after Martinez had been terminated in 2008.  In January 2009, she testified under oath that Martinez was fired for these reasons:

> [I]t was in relation to the way that he was running the store.  So many things that was going on.  I think there was something that had to do with petty cash, something having to do with falsifying some information.  I don't remember all the details in regards to his termination, but I know that it was his overall lack of management performance and conduct at 964 [Office Depot store location].

[Doc. 46, Ex. 8, Wilson Dep. in Marquez v. Office Depot, p. 94.] Wilson made no mention of Martinez being terminated for unauthorized use of a money card in that deposition, even though the April 2008 termination decision was much more recent as of January 2009.

Grant also testified about Martinez's termination in the Marquez lawsuit and stated the reason for termination was "misconduct" and "irregularities with petty cash." [Doc. 46, Ex. 9, Grant Dep. in Marquez, p. 173.]  Even though Grant's deposition also took place in January 2009, when his recollection of Martinez's termination might have been fresher, he did not mention Martinez's unauthorized use of a money card.  While the "petty cash" or "misconduct" explanations might generally encompass unauthorized use of money card, the Court concludes these varying explanations contribute to finding the existence of genuine issues of material fact concerning whether Office Depot's explanations for terminating Martinez are "unworthy of belief."[17]

---

[17]Office Depot argues that the depositions of Grant and Wilson in the prior lawsuit are not admissible because the prior lawsuit did not involve the same parties and same subject matter. [Doc. 52, p. 7, n. 1.] However, sworn testimony about Martinez by personnel or managers authorized by Office Depot to make such statements might be considered admissions by a party-opponent.  See Rule 801(d)(2) of the Rules of Evidence.

In addition, there are inconsistencies as to whether Martinez received progressive discipline prior to termination.  Martinez testified that he never received any verbal counseling or progressive discipline prior to termination. [Doc. 46, Martinez Aff.] Wilson testified that the store manager (Todd) utilized progressive discipline regarding Martinez's termination and that there was a "record of discussion" between Todd and Martinez two to four days before Office Depot terminated Martinez.  When asked if that was not much time to proceed through progressive discipline, Wilson answered that it was enough time – "first step is conversation, so yes." [Doc. 46, Wilson Dep. at 79.] During Todd's deposition, however, he seemed only vaguely familiar with Office Depot's policy of progressive discipline and when asked if Martinez was given progressive discipline before termination, Todd testified: "I wouldn't think so." [Doc. 46, Todd Dep. at pp. 147-48.] Again, these are the types of inconsistencies and weaknesses that raise genuine issues of material facts related to Office Depot's proffered reasons for the termination decision.

Martinez also provides statistical evidence in support of his showing of pretext.  Specifically, Office Depot was requested to provide the Human Rights Division (in the administrative proceeding), identities of all managerial associates terminated in New Mexico from December 2207 to October 2008, a time frame of roughly 5 months before and after Martinez was terminated. [Doc. 46, p. 16.] The statistics showed that all 8 managerial associates Office Depot terminated in this period were members of a protected class by race, ethnicity, or age.  Martinez was the seventh managerial employee in a protected class who was fired in a three month period in 2008.  Grant, the district manager of Office Depot in New Mexico, was appointed to the position about a month before the terminations began. [Doc. 46, Ex. 8.]

While true that statistical data may provide evidence of pretext, Garrett, 305 F.3d at 1217, "[s]tatistical evidence which fails to properly take into account nondiscriminatory explanations does

not permit an inference of pretext." Furr v. Seagate Tech. Inc., 82 F.3d 980, 987 (10th Cir. 1996), *cert. denied* 519 U.S. 1056 (1997).  Here, Martinez provides no evidence as to why the other seven managerial associates were terminated or whether nondiscriminatory explanations might account for the termination decisions.

Office Depot did not provide evidence that the other managerial associates were terminated for nondiscriminatory reasons.  Instead, Office Depot states that Martinez impermissibly relied on a "single set of statistics, taken out of context." [Doc. 52, p. 9.] Office Depot provides Wilson's affidavit to show that out of all Office Depot managers employed between December 2007 and October 2008, seven of the thirteen were within a protected class of race as defined in Title VII (i.e., non-white). [Doc. 42, Wilson Aff, p. 3.] During the same time frame, six of thirteen managers were over age 40.  Office Depot provided other statistical information regarding current employment of employees in protected categories, but the current information is not particularly pertinent.

The Court concludes that while Martinez's statistical evidence is not compelling, the statistics, along with all of the other circumstantial evidence discussed above, are sufficient to raise a genuine issue of material fact regarding whether Office Depot's reason for terminating Martinez was "unworthy of belief."

Martinez's purported direct evidence of discrimination is meager.  With respect to the age discrimination claim, Martinez states that shortly before Mr. Schrag, a 55-year old Office Depot store manager, was terminated in January 2008, Schrag contended that Grant had asked him if Schrag was too old to be store manager.  Regarding the national origin claim, Martinez testified that "a year or so" before January 2008, Martinez's district manager and store manager suggested that Office Depot would pay for English classes for Martinez because his Spanish accent was too strong. Finally, Martinez states that a former manager, at some point (apparently much earlier when

18

Martinez was worked in El Paso), made pejorative comments concerning the purchasing habits of Mexicans at Office Depot's location in El Paso.

Such isolated, sporadic, or remote comments, most of which were not directed to Martinez, add nothing to the equation of pretext.  However, Martinez need not provide direct evidence to survive summary judgment on the age and national origin claims.  "Such evidence is not necessary to prove a discrimination claim under Title VII or the ADEA."  Garrett, 305 F.3d at 1219, n. 5 (*citing* Kendrick, 220 F.3d at 1225).

The Court concludes that when viewed in the aggregate, Martinez's proffered evidence is "sufficient to raise a genuine doubt about [Office Depot's] motivation . . . ."  Id. at 1220 (*citing* EEOC v. Horizon/CMS Healthcare Corp., 220 F.3d 1184, 1200 (10th Cir. 2000)).  Stated differently, Martinez raised genuine issues of material fact by demonstrating evidence of "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that [Office Depot] did not act for the asserted non-discriminatory reasons."  *See* Jaramillo v. Colo. Judicial Dep't, 427 F.3d 1303, 1308 (10th Cir. 2005) (*per curiam*) (internal citation omitted).  Thus, the motion for summary judgment as to the ADEA age discrimination claim and the Title VII and HRA national origin discrimination claims is denied.

## II.      *At-Will Employment and Breach of Employment Contract Claim:*

Under New Mexico law, "[e]mployment without a definite term is presumed to be at will." Trujillo v. N. Rio Arriba Elec. Coop., Inc., 131 N.M. 607, 615, 41 P.3d 333, 341 (2001).  At-will employment means that employment is terminable at will by either the employer or the employee for any reason or for no reason at all.  Hartbarger v. Frank Paxton Co., 115 N.M. 665, 668, 857 P.2d 776, 779 (1993), *cert. denied*, 510 U.S. 1118 (1994).  There are exceptions to the at-will rule,

however; *e.g.*, "where the facts disclose the existence of an implied employment contract provision that limits the employer's authority to discharge," <u>Trujillo</u>, 131 N.M. at 615, 41 P.3d at 341 (quotation omitted), or where the discharge of an employee contravenes a "clear mandate of public policy." <u>Vigil v. Arzola</u>, 102 N.M. 682, 688, 699 P.2d 613, 619 (Ct. App.1983), *rev'd in part on other grounds by* 101 N.M. 687, 687 P.2d 1038 (1984), *overruled in part on other grounds by* <u>Chavez v. Manville Prods. Corp.</u>, 108 N.M. 643, 777 P.2d 371 (1989).

The undisputed material facts establish that Martinez was an at-will employee and that Martinez's employment with Office Depot could be terminated for any or no reason. Martinez was informed of and expressly agreed to his at-will status in an employment document he reviewed and signed. [Doc. 42, Ex. 42-2, A-1.] As a management employee, he was trained in Office Depot's policies and procedures, which included express language in its handbook/manual concerning at-will employment, *e.g.,* "[t]he employment relationship between the Company and any associate may be terminated at the will of either party." Martinez does not dispute that he received, signed or agreed to the terms of these documents.

Instead, Martinez argues that his at-will employment status was modified by Office Depot's words, actions, and employment manuals. Essentially, he asserts that an implied contract arose based on the progressive discipline policy or procedure set out in Office Depot's handbook/manual. Martinez contends that he had a contractual right to receive progressive discipline before termination and to be terminated in a "fair and expeditious manner." [Doc. 46, p. 20.] The only other representation upon which he relies was an alleged statement made to him by a former manager, perhaps in 2007 or 2008, promising him that he would be able to attend manager's training school when the next training session occurred in May 2008. Martinez asserts that this purported promise

to attend training altered his at-will employment to that of continued employment and perhaps the benefit of a promotion.

The actual language of the handbooks or manuals upon which Martinez relies belie his position.  For example, Martinez signed an agreement with Office Depot expressly stating: "this Handbook is neither a contract of employment nor a legal document. . . . " [Doc. 42, Ex. 42-2, A-1.] Office Depot's manual or handbook, containing language concerning termination of employment and progressive discipline, further states: "the policies and procedures set forth in this manual provide guidelines for management and associates during employment, but do not create contractual rights regarding termination or otherwise."   [Doc. 42, Ex. 42-2, A-2, p. 2.] The progressive discipline provision states:

> The Company reserves the right to use some or all of the following forms of discipline: verbal counseling, Performance Improvement Process or immediate termination. . . . The Performance Improvement Process is a guideline only.  It is not a contract of employment, and does not invalidated [sic] the Company's right to terminate the employment relationship with an associate at will.

[Doc. 46, Ex. 7, p. 3.] In addition, Office Depot's employment manual allows for immediate termination for various misconduct.  None of the written policy/procedure language amounts to an implied contract with Martinez, promising him progressive discipline prior to termination.

In addition, Martinez fails to provide specific admissible evidence regarding any alleged written representations, oral representations or promises.  Likewise, he fails to provide admissible evidence of the conduct of the parties, or a combination of representations and conduct that would alter his at-will status.  *See* Hartbarger, 857 P.2d at 780.  While New Mexico law requires that "the totality of the parties' relationship, circumstances, and objectives will be considered to overcome the presumption that the employment [] was terminable at will," Martinez's evidence "falls short

in the face of the clear, unequivocal language stating that employment was at will." *See* Montaño

v. Christmas by Krebs Corp., Civ. No. 07-2235, 293 F. App'x 625, 628 (10th Cir. Sept. 18, 2008)

(unpublished) (internal citations omitted) (applying New Mexico law).

      Because Martinez's breach of contract claim fails as a matter of law, Office Depot is entitled

to summary judgment on this claim.

**III.**    ***Wrongful Discharge Claim:***

      In New Mexico, wrongful or retaliatory discharge is a recognized exception to the at-will

employment doctrine. Silva v. Albuquerque Assembly & Distrib. Freeport Warehouse Corp., 106

N.M. 19, 20, 738 P.2d 513, 515 (N.M. 1987). For an employee to recover under a claim for

wrongful discharge, he must demonstrate that he was discharged because he performed an act that

public policy has authorized or would encourage. Vigil, 102 N.M. at 689, 699 P.2d at 620. "The

linchpin of a cause of action for retaliatory [or wrongful] discharge is whether by discharging the

complaining employee, the employer violated a 'clear mandate of public policy.'" Shovelin v.

Central N.M. Elec. Coop., 115 N.M. 293, 303, 850 P.2d 996, 1006 (1993).

      Martinez fails to present any evidence that he was terminated for performing "an act that

public policy authorized or would encourage." In fact, he appears to merge his claims of breach of

implied contract and wrongful discharge, without discussing any evidence of a public policy that

Office Depot allegedly violated. Because Martinez did not raise a genuine issue of material fact as

to a wrongful discharge claim, Office Depot is entitled to summary judgment on this claim.

**IV.**    ***Punitive Damages Claim:***

      Martinez argues that he is entitled to an award of punitive damages on the remaining Title

VII claim of national origin claim, based on his job history, loyalty to Office Depot, favorable work

reviews, lack of discipline, the facts surrounding his termination, and the "guilty mental state" of managers Grant and Wilson.[18]

Punitive damages are available under Title VII where a plaintiff demonstrates that a defendant discriminated with malice or with reckless indifference to federally protected constitutional rights.  Duprey v. Twelfth Judicial Dist. Court, No. CIV 08-0756 JB, 2009 WL 2482170, at *8 (D.N.M. Jul. 28, 2009) (unpublished) *(citing* Hysten v. Burlington Northern Santa Fe Ry. Co., 530 F.3d 1260, 1278 (10th Cir. 2008))

> The Title VII standard for punitive damages requires something more than the employer's mere awareness that its conduct constitutes intentional discrimination however egregious it might be. Thus, [t]he terms 'malice' or 'reckless indifference' . . . pertain to the employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination.

Id. (internal citations and quotations omitted).

Given the circumstances surrounding Martinez's long-time employment, the factual issues regarding Martinez's termination, and the Court's conclusion that Martinez raised genuine issues of materials facts concerning whether Office Depot's articulated reason for the adverse action was pretextual or unworthy of belief, the Court determines that Martinez's request for punitive damages withstands summary judgment.  The evidence presented thus far could result in a jury determining that Office Depot acted with reckless indifference to Martinez's federally protected rights.  Thus, summary judgment is denied on the request for punitive damages.

---

[18]Martinez agreed that he could not recover an award of punitive damages under the ADEA or the HRA. [Doc. 46, p. 22.] No award of punitive damages can be granted on the state tort claims which are dismissed.

<u>CONCLUSION</u>

The Court grants summary judgment in favor of Office Depot on the state tort claims of breach of implied contract and wrongful discharge.  Summary judgment on the age discrimination claim under the ADEA, the national origin discrimination claims under Title VII and the HRA, and the punitive damages claim is denied.

IT IS THEREFORE ORDERED that Defendants' Motion for Summary Judgment is GRANTED in part and DENIED in part, with the result that:

(1) the state law claims of breach of implied employment contract and wrongful discharge are dismissed with prejudice;

(2) the age discrimination claim under the ADEA proceeds against Office Depot;

(3) the national origin discrimination claim under Title VII proceeds against Office Depot, and the national origin discrimination claim under the New Mexico's Human Rights Act proceeds against all Defendants; and

(4) the punitive damages request proceeds against Office Depot.

_Lorenzo F. Garcia_
**Lorenzo F. Garcia**
**UNITED STATES MAGISTRATE JUDGE**